[Opinion certified for partial publication.*]
Counsel
Jay M. Kohorn for Defendant and Appellant.
Ira Reiner, City Attorney, Jack L. Brown and Greg Wolff, Deputy City Attorneys, for Plaintiff and Respondent.
Opinion
COOPERMAN, J.
—Following a jury trial, defendant Roger Kenneth Tran-tham was found guilty as charged in a misdemeanor complaint with entering, remaining, staying or loitering in a park between the hours of 10:30 p.m. and 5 a.m. of the following day. (L.A. Mun. Code, § 63.44, subd. (B)(14) [hereafter, section (or §) 63.44(B)(14)].) We find no merit to defendant’s position on appeal and affirm.
On January 25, 1983, Los Angeles Police Officer Gary Brusatori went to North Hollywood Park to investigate complaints from residents concerning loitering at the park.[1] Officer Brusatori and his partner arrived at the park at approximately 11 p.m. A short time later, Officer Brusatori saw defendant drive into the parking lot. There are signs posted on either side of the driveway used by defendant indicating that the park is closed between 10:30 p.m. and 5 a.m. Each sign is approximately 12 inches wide by 18 inches high and placed about six feet above the ground. A street light on the sidewalk illuminated both signs and, in addition, the headlights of defendant’s vehicle further illuminated the signs as he entered the parking area.
Defendant left his vehicle and walked into a nearby public restroom. On the south side of this restroom is posted a third sign declaring that the park is closed between 10:30 p.m. and 5 a.m. This sign, which is the same size *Supp. 6 as the two signs posted at the park entrance, is illuminated by a light on the southeast comer of the restroom. After two or three minutes, defendant left the restroom, walked to a group of trees, and spent seven to eight minutes walking behind the trees.
There are tennis courts at this park about 200 yards from the trees where defendant was lingering but Officer Brusatori saw no one playing tennis. The closest telephone was also about 200 yards from the tree area. Officer Bmsatori placed defendant under arrest at approximately 11:15 p.m.
Defendant claimed in his defense that he was on his way home from work and drove into the park in search of a restroom when he saw people playing tennis. It was revealed on cross-examination, however, that it would have been more direct for defendant to have taken the freeway if he was going home and that defendant could not recall the names of the people he had supposedly worked for that evening. The evidence further showed that defendant drove by a gas station that had restrooms and an open restroom near the tennis courts before entering the park.
I
On appeal defendant attacks his conviction by challenging the constitutionality of section 63.44(B)(14),[2] specifically its proscription against any person entering, remaining, staying, or loitering in a public park between the hours of 10:30 p.m. and 5 a.m.[3]
Seizing upon the word “loitering,” defendant labels section 63.44(B)(14) an antiloitering or curfew ordinance and condemns it as violative of due process for the reason that the ordinance fails to afford the requisite notice of the conduct proscribed and for the additional reason that it is void for vagueness and overbreadth.
*Supp. 7 In this regard defendant cites Katzey v. County of Los Angeles (1959) 52 Cal.2d 360 [341 P.2d 310]. The Katzey court observed that: “Both the California Constitution, article I, section 13, and the Constitution of the United States, Fourteenth Amendment, provide that no person shall be deprived of life, liberty, or property without due process of law. Due process means that ‘No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids.’ (Lanzetta v. New Jersey, 306 U.S. 451, 453 [59 S.Ct. 618, 83 L.Ed. 888]; In re Porterfield, 28 Cal.2d 91, 120 [168 P.2d 706, 167 A.L.R. 675].)” (Id., at p. 370; accord Mandel v. Municipal Court (1969) 276 Cal.App.2d 649, 659 [81 Cal.Rptr. 173].) He further asserts that “the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. [Citations.]” (Kolender v. Lawson (1983) 461 U.S. 352, 357 [75 L.Ed.2d 903, 909, 103 S.Ct. 1855, 1858].) Moreover, a statute that makes no distinction between harmful and innocent conduct is void for overbreadth. (See Seattle v. Drew (1967) 70 Wn.2d 405 [423 P.2d 522, 25 A.L.R.3d 827]; see also Model Pen. Code (Proposed Official Draft 1962), § 250.6; Alves v. Justice Court (1957) 148 Cal.App.2d 419 [306 P.2d 601]; cf. In re Nancy C. (1972) 28 Cal.App.3d 747 [105 Cal.Rptr. 113].)
Although conceding that “[a] local entity might have the right to regulate use of its parks,” defendant contends that this cannot be done “in a loitering statute which provides no notice requirement,” which he claims is the case here since “[t]here is no requirement under the present law for actual knowledge or scienter by a defendant, for posted signs, for lighting for signs which might be posted, for posting of signs at all possible entrances such as jogging trails, for warnings by police, or for any other adequate notice or for any notice whatsoever.” He concludes that this lack of actual notice violates the notice mandate of the due process clause of the Fourteenth Amendment. (Lambert v. California (1957) 355 U.S. 225, 227 [2 L.Ed.2d 228, 230-231, 78 S.Ct. 240].)
Defendant submits that “[i]n order to be constitutional, the present . . . ordinance would have to articulate some overt conduct which would be sufficient to provide law enforcement with probable cause to believe that defendants were lingering [‘loitering’] with the specific intent to commit a crime.” (See In re Cregler (1961) 56 Cal.2d 308 [14 Cal.Rptr. 289, 363 P.2d 305].) He argues that the absence of such standard renders section 63.44(B)(14) impermissibly vague for the reason that this deficiency encourages arbitrary and discriminatory law enforcement. (Papachristou v. City of Jacksonville (1972) 405 U.S. 156, 169-171 [31 L.Ed.2d 110, 119- *Supp. 8 121, 92 S.Ct. 839]; Kolender v. Lawson, supra, 461 U.S. 352.) He further argues that “[s]imply lingering [‘loitering’], alone, is not and cannot be made a crime . . .,” and thus, section 63.44(B)(14) is overbroad to the extent it criminalizes such innocent conduct.
We find no constitutional infirmity.
The basic fallacy of defendant’s position is his myopic focus upon the word “loiter,” which has led him to misconstrue the purpose and nature of section 63.44(B)(14). “The cardinal rule of statutory construction is that a provision is to be construed so as to effect the intent of the Legislature. CPeople v. Ruster (1976) 16 Cal.3d 690, 696 [129 Cal.Rptr. 153, 548 P.2d 353, 80 A.L.R.3d 1269]; Mercer v. Perez (1968) 68 Cal.2d 104, 112 [65 Cal.Rptr. 315, 436 P.2d 315].) When determining legislative intent, the plain meaning of clear statutory language should be followed unless there is compelling evidence that another meaning was intended. (People v. Chadd (1981) 28 Cal.3d 739, 746 [170 Cal.Rptr. 798, 621 P.2d 837]; In re Andrews (1976) 18 Cal.3d 208, 212 [133 Cal.Rptr. 365, 555 P.2d 97].)” (People v. DePaul (1982) 137 Cal.App.3d 409, 414 [187 Cal.Rptr. 82].)
It is also incumbent upon us to construe “ordinances as a whole, and in context, giving effect wherever possible to the usual and ordinary import of the language used, and avoiding interpretations which render a measure unreasonable, disharmonious, or superfluous in whole or in part. [Citation.]” (Longshore v. County of Ventura (1979) 25 Cal.3d 14, 24 [157 Cal.Rptr. 706, 598 P.2d 866]; see also Estate of McDill (1975) 14 Cal.3d 831, 837 [122 Cal.Rptr. 754, 537 P.2d 874].)
Mindful of these principles of statutory construction, we scrutinize section 63.44(B)(14). From our review of that section in its entirety, we are persuaded that it is simply a park closure law. In other words, “the closing hours” are “the hours of 10:30 . . . p.m. and 5:00 . . . a.m. of the following day” for any park under its purview except Royal Palms Beach whose closing hours are “the hours of 8:00 . . . p.m. and 5:00 . . . a.m. of the following day.” Moreover, a supervising employee “may extend the 10:30 p.m. closing time for up to one hour to accommodate any departmentally approved event.” (§ 63.44(B)(14).)
Also self-evident from our review of section 63.44(B)(14) is that the purpose of its directive that “[n]o person shall enter, remain, stay or loiter in any park between the hours of 10:30 . . . p.m. and 5:00 .. . a.m. of the following day . . .” is to place a person on notice as to what conduct is proscribed when the park is closed.
*Supp. 9 In addition to the notice component of the void-for-vagueness doctrine, its more important element has been recognized as its requirement for minimal guidelines to govern law enforcement in order to discourage arbitrary and discriminatory enforcement of the law. (Kolender v. Lawson, supra, 461 U.S. 352, 358 [75 L.Ed.2d 903, 909, 103 S.Ct. 1855, 1859].)
It is in the context of a statute’s propensity for containing discriminatory law enforcement that courts have determined whether the words “loiter” and “loitering” in a statute must be construed to connote lingering for an innocent purpose or lingering for a sinister purpose. “It is a well-settled principle that if the terms of a statute are by a fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution the statute will be given that meaning rather than another in conflict with the Constitution. (Braxton v. Municipal Court (1973) 10 Cal.3d 138, 145 [109 Cal.Rptr. 897, 514 P.2d 697].)” (People v. Perrine (1975) 47 Cal.App.3d 252, 259 [120 Cal.Rptr. 640].)
Moreover, it is also firmly established that courts will uphold a statute against a constitutional challenge ‘“if its terms may be made reasonably certain by reference to other definable sources.’ [Citations.]” (People v. Superior Court (Hartway) (1977) 19 Cal.3d 338, 345 [138 Cal.Rptr. 66, 562 P.2d 1315].) As a general proposition, this may be accomplished by referring to the dictionary definition of the words or terms in question. (See, e.g., Hartway, supra, at pp. 345-346; People v. Katrinak (1982) 136 Cal.App.3d 145, 156 [185 Cal.Rptr. 869]; In re Nancy C., supra, 28 Cal.App.3d 747, at fn. 9.)
 However, where the ordinary meaning of a particular word or term raises an overbreadth or vagueness problem, then “[t]he judiciary bears an obligation to ‘construe [the statute] to give specific content to terms that might otherwise be unconstitutionally vague.’ [Citation.]”[4] (Pryor v. Municipal Court (1979) 25 Cal.3d 238, 253 [158 Cal.Rptr. 330, 599 P.2d 636].) In that regard, courts will give the *Supp. 10 words or terms in question a restrictive rather than a general meaning where several constructions are possible and where adopting the narrow one over the broader one will render the statute free from doubt as to its constitutionality. (In re Cregler, supra, 56 Cal.2d 308, 311-312; In re Huddleson (1964) 229 Cal.App.2d 618, 624-625 [40 Cal.Rptr. 581].)
The verb to “loiter” in its general, innocent manifestation has been defined as “to interrupt or delay an activity or an errand or a journey with or as if with aimless idle stops and pauses and purposeless distractions . . . .” (Webster’s New Internat. Dict. (3d ed. (1971) p. 1331.)
In the context of a criminal statute, whether characterized as a curfew or an antiloitering law,[5] courts have held that the words “loiter” or “loitering” may be construed to connote lingering “for the purpose of committing a crime as opportunity may be discovered.” (In re Cregler, supra, 56 Cal.2d at p. 312; In re Huddleson, supra, 229 Cal.App.2d 618, 622.)
The rationale behind such a restrictive and sinister connotation is to avoid declaring such a statute void for uncertainty by giving a reasonable and practical construction to its language. (Pryor v. Municipal Court, supra, 25 Cal.3d 238, 253.)
“Manifestly one who goes to a bus station or railroad depot and waits for the purpose of buying a ticket, boarding the conveyance, meeting a relative or friend actually expected to arrive, or with any other legitimate objective, is not loitering within the sense of the statute. Loitering as forbidden includes waiting, but mere waiting for any lawful purpose does not constitute such loitering.” (In re Cregler, supra, 56 Cal.2d at p. 312.)
Likewise, “persons who merely sit on park benches, loll on public beaches, pause in the vicinity of schools or linger in the many public areas frequented by children cannot be reasonably considered as loitering within the compass of the statute.” (In re Huddleson, supra, 229 Cal.App.2d 618, 625.)
The above examples are illustrative of those situations where the absence of such a sinister connotation would provide the police with unbridled dis *Supp. 11 cretion to determine arbitrarily and upon whim who was loitering and who was not and to arrest upon mere suspicion of criminal activity rather than the constitutionally mandated standard of probable cause.[6] (People v. Bruno (1962) 211 Cal.App.2d Supp. 855, 859 [27 Cal.Rptr. 458]; accord People v. Caylor (1970) 6 Cal.App.3d 51, 56 [85 Cal.Rptr. 497].)
Conversely, where the problem of discriminatory law enforcement does not arise, there is no need to construe the words “loiter” and “loitering” in their more restrictive, sinister sense instead of imbuing them with their usual, innocent sense. (See In re Nancy C. (1972) 28 Cal.App.3d 747 [105 Cal.Rptr. 113]; cf. In re Cregler, supra, 56 Cal.2d at p. 312; In re Huddleson, supra, 229 Cal.App.2d at p. 624.)
The court in In re Nancy C., supra, 28 Cal. App.3d 747, upheld a curfew statute which used the word “loiter” to connote an innocent purpose against a challenge that “it unreasonably interfere^] with the exercise of personal rights ... by being too broad and discriminatory” where the “curfew ordinance in question [did] not leave it to the whim of a police officer to determine if a minor is on a street for a lawful purpose.” (Id., at pp. 753, 755, 757.) In so doing, the court employed the following analysis, which is equally applicable here:
“The constitutional standard to be applied when an ordinance such as this is attacked as unduly restrictive of personal rights is one of ‘reasonableness.’ (Alves v. Justice Court (1957) 148 Cal.App.2d 419, 423-424 [306 P.2d 601].) In Alves the court stated at page 422: ‘The rule is too well established to warrant citation of authority that a municipality, under its inherent police power, may enact legislation which may interfere with the personal liberties of its citizens and impose penalties for the violation thereof where the general welfare, public health and safety demand such enact *Supp. 12 ment; but this rule is always subject to the rule of reasonableness in relation to the objects to be attained.’
“The question then is whether the ordinance in question was reasonable, in view of the needs of the state, with reasonableness being roughly measured by the gravity of the evil to be corrected and the importance of the right invaded. (See Note, Curfew Ordinances and the Control of Nocturnal Juvenile Crime (1958) 107 U.Pa.L.Rev. 66, 97.) Expressed another way, ‘the measure so adopted must have some relation to the ends thus specified.’ (In re Hall (1920) 50 Cal.App. 786, 789 [195 P. 975].) The court in Thistlewood v. Ocean City (1964) 236 Md. 548, 556 [204 A.2d 688, 693] suggested the following test: ‘(1) Is there an evil? (2) Do the means selected to curb the evil have a real and substantial relation to the result sought? (3) If the answer to the first two inquiries is yes, do the means availed of unduly infringe or oppress fundamental rights of those whose activities or conduct is curbed?’ ” (In re Nancy C., supra, 28 Cal.App.3d at p. 754.)
Initially we observe that as juxtaposed to the words “enter, remain, stay,” which clearly convey no sinister connotations, the word “loiter” in section 63.44(B)(14) also connotes an innocent purpose. (See In re Nancy C., supra, p. 755; cf. People v. Teresinski (1982) 30 Cal.3d 822, 830 [180 Cal.Rptr. 617, 640 P.2d 753].)
To determine if the words “enter, remain, stay or loiter” in that section must be infused with a sinister connotation to pass constitutional muster we examine first the nature and purpose of section 63.44 generally in conjunction with our scrutiny of section 63.44(B)(14) in particular.
 From our review of section 63.44, entitled “Regulations Affecting Park and Recreation Areas,” we conclude that it is regulatory in nature,[7] rather than criminal, and that the purpose of its numerous subdi *Supp. 13 visions and subsections is to restrict and regulate the use of public parks and recreational areas under its purview in order to confine such usage to activities compatible with the natural resources of such places, otherwise to conserve those places in their pristine state, and to promote public health, safety and welfare in the usage of those parks and recreational areas. We further conclude that section 63.44(B)(14), a park closure regulation, was enacted to further those legislative purposes.
Ordinarily, ‘“[a] park is a pleasure ground set apart for the recreation of the public, to promote its health and enjoyment. . ." (San Vicente etc. School v. County of Los Angeles (1956) 147 Cal.App.2d 79, 85 [304 P.2d 837].) It is beyond dispute that a local entity has exclusive jurisdiction over the management and control of its parks and may enact and enforce such regulations and rules that are necessary or appropriate to promote park purposes and to ensure the public’s health, safety and welfare in the usage of its parks.[8] (See, generally, 48 Cal.Jur.3d, Parks, etc., §§ 1-3, 6-8, 10, pp. 32-36, 41-49, 52-54.)
With regard to the City of Los Angeles in particular, we observe that: “A charter city has inherent authority to control, govern and supervise its own parks. ‘[T]he disposition and use of park lands is a municipal affair (Wiley v. City of Berkeley, 136 Cal.App.2d 10 [288 P.2d 123]; Mallon v. City of Long Beach, 44 Cal.2d 199 [283 P.2d 481]), and a charter city “has plenary powers with respect to municipal affairs not expressly forbidden to it by the state Constitution or the terms of the charter.” (City of Redondo Beach v. Taxpayers, Property Owners, etc. City of Redondo Beach, 54 *Supp. 14 Cal. 2d 126, 137 [5 Cal.Rptr. 10, 352 P.2d 170].)’” (Simons v. City of Los Angeles (1976) 63 Cal.App.3d 455, 468 [133 Cal.Rptr. 721]; see also Reagan v. City of Sausalito (1962) 210 Cal.App.2d 618, 625 [26 Cal.Rptr. 775]; Gov. Code, § 25353.)
It is likewise beyond dispute that: “A municipality has broad power to enact ‘all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.’ (Cal. Const., art. XI, § 7.) An ordinance so enacted will ordinarily be upheld if ‘it is reasonably related to promoting the public health, safety, comfort, and welfare, and if the means adopted to accomplish that promotion are reasonably appropriate to the purpose. [Citations.]’ (Higgins v. City of Santa Monica, 62 Cal.2d 24, 30 [41 Cal.Rptr. 9, 396 P.2d 41].)” (Sunset Amusement Co. v. Bd. of Police Comm’rs. (1972) 7 Cal.3d 64, 72 [101 Cal.Rptr. 768, 496 P.2d 840].)
We therefore conclude that the subject park ordinance was well within the power of the City of Los Angeles to enact. Although the information relied upon by the city in passing the ordinance is not before us, the ordinance is presumed valid and to have been based on “any state of facts supporting it that reasonably can be conceived.” (Higgins v. City of Santa Monica (1964) 62 Cal.2d 24, 30-31 [41 Cal.Rptr. 9, 396 P.2d 41]; accord, Baity v. Civil Service Com. (1980) 103 Cal.App.3d 155, 161 [162 Cal.Rptr. 812]; People v. Aguiar (1968) 257 Cal.App.2d 597, 601 [65 Cal.Rptr. 171].)
Having set the scene, so to speak, we now subject section 63.44(B)(14) to the three-part test enunciated in Thistlewood v. Ocean City (1964) 236 Md. 548 [204 A.2d 688] and applied in In re Nancy C., supra, 28 Cal.App.3d 747. With regard to the initial inquiry concerning the existence of “an evil,” we focus upon the following concerns.
In Clark v. Community for Creative Non-Violence (1984) 468 U.S. — [82 L.Ed.2d 221, 104 S.Ct. 3065], the Supreme Court upheld a National Park Service regulation prohibiting camping, with a specific ban on sleeping, in certain national parks against a challenge that it violated the First Amendment when applied to prohibit demonstrators from sleeping in Lafayette Park and the Mall in conjunction with a demonstration intended to call attention to the plight of the homeless. (Id., at p. — [82 L.Ed.2d at p. 224].)
The Clark court noted that “the Government has a legitimate interest in ensuring that the National Parks are adequately protected” and instructed “[a]ll those who would resort to the parks must abide by otherwise valid rules for their use, just as they must obey traffic laws, sanitation regulations, *Supp. 15 and laws to preserve the public peace. This is no more than a reaffirmation that reasonable time, place, and manner restrictions ... are constitutionally acceptable.”[9] (Clark, supra, 468 U.S. at p. — [82 L.Ed.2d at pp. 229-230].) Specifically, the court found that “there is a substantial government interest in conserving park property, an interest that is plainly served by, and requires for its implementation, measures such as the proscription of sleeping that are designed to limit the wear and tear on park properties.” (Id., at p. - [82 L.Ed.2d at p. 230].)
We likewise find that the park closure regulation embodied in section 63.44(B)(14) is no more and no less than simply a time, place and manner restriction upon the usage of the public parks and recreation areas under its ambit. The closure of the parks for the late night hours delineated in section 63.44(B)(14) serves a substantial and legitimate governmental interest in “limiting wear and tear on park properties” in order to further the goal of “conserving park property”.[10] (Ibid.) More importantly, the intent and purpose of section 63.44(B)(14) is clearly to establish a reasonable closing time for public parks in the interest of public safety and welfare.
With regard to the second inquiry, we find that the means used, i.e., to prohibit any person from entering, remaining, staying, or loitering in any *Supp. 16 park during the specified time frame, to implement the parks’ closure has a “real and substantial relation to the result sought.” (Thistlewood, supra, 236 Md. at p. 556 [204 A.2d at p. 693].)
 As to the remaining inquiry concerning whether “the means availed of unduly infringe or oppress fundamental rights of those whose activities or conduct is curbed”[11] (ibid.), we must pivot our attention momentarily to decisions of other jurisdictions for the reason that the constitutionality of a park closure ordinance such as the one sub judice is a matter of first impression in California. (See, generally, 59 A.L.R.3d 321, § 9.)
In People v. Zalon (1955) 208 Misc. 855 [145 N.Y.S.2d 269] the court upheld a New York City Park Department rule prohibiting anyone from loitering or remaining in any park after midnight against a constitutional challenge by finding that “it is a reasonable measure of local control which affects civil liberties only in an allowable and minor degree. Cox v. State of New Hampshire [1941] 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049.” (Id., at pp. 270-271.)
Also relying upon Cox v. New Hampshire, supra, 312 U.S. at page 576 [85 L.Ed. at pages 1053-1054] and on Cox v. Louisiana (1965) 379 U.S. 536, 554 [13 L.Ed.2d 471, 484, 85 S.Ct. 453], a district court in Peters v. Breier (E.D.Wis. 1971) 322 F.Supp. 1171 upheld a Milwaukee city ordinance establishing a “ ‘curfew for Water Tower Park’ ” as facially valid against a challenge to its constitutionality. The Peters court announced that “[t]he right of the city to exclude the public from designated areas at designated times cannot be seriously questioned so long as the restriction is as narrowly defined as it is in the ordinance in question.” (Id., at p. 1172.)
In this regard, the court expressly found: “its restrictions are sufficiently narrow so that under no reasonable construction or application should the ordinance itself be denominated unconstitutional. The ordinance carefully defines the area that is restricted and the hours of the curfew. It also provides for appropriate notice. It applies to all persons and cannot be condemned as selective or discriminatory. Unlike Portland v. James, 251 Or. *Supp. 17 8, 444 P.2d 554 (1968), which broadly restricted the use of any street, alley, or public place, the ordinance in question carefully delimits the curfew to a small, localized area.” (Id., at pp. 1171-1172.) In holding that “the ordinance is patently constitutional” the Peters court opined “that any improper application of the ordinance would reflect, not its unconstitutionality, but rather the blundering of the constable. [Citation.]” (Peters, supra, 322 F.Supp. at p. 1172.)
A Chicago park closure regulation precluding the use of public parks between 11 p.m. and 4 a.m. was upheld by an Illinois appellate court as a reasonable exercise of the city’s powers in Chicago Park District v. Altman (1970) 127 Ill.App.2d 467 [262 N.E.2d 373, 374].) The court reasoned: “Here, the interests of safety and public welfare are sufficient objectives to warrant closing public parks during the five-hour nighttime period. We believe that the deprivation of defendant’s uncontrolled liberty, by limiting his absolute use of the park, is minimal compared to the desirable public safety and welfare objectives served by this ordinance.” (P. 375.)
From our analysis of those decisions in the other jurisdictions we have gleaned the principle that, generally speaking, late night park closure regulations pass constitutional muster as valid exercises of municipal power to restrict the use of a municipality’s public facilities regarding reasonable time, place, and manner limitations.
In the present case we likewise uphold section 63.44(B)(14) as a reasonable late night park closure regulation. Specifically, we find that its proscription against anyone entering, remaining, staying, or loitering in any park during the late night hours in question is not void for vagueness or overbreadth. No overbreadth problem arises since the regulation does not possibly encompass innocent as well as criminal conduct inasmuch as its proscription against anyone going into or being in a park for any length of time during the specified time period applies across the board, which means that it is of no legal consequence if a person enters or is in the park for an innocent or criminal purpose. (See, generally, Bowland v. Municipal Court (1976) 18 Cal.3d 479, 493-494 [134 Cal.Rptr. 630, 556 P.2d 1081].) Moreover, no vagueness problem arises for the reasons that the regulation places a person on notice as to precisely what conduct is proscribed and the proscription itself leaves no room for the exercise of discretion by law enforcement officers as to the propriety of any particular person’s presence in the park. (Peters v. Breier, supra, 322 F.Supp. 1171, at pp. 1171-1172; Burg, supra, 35 Cal.3d at p. 270; Pryor, supra, 25 Cal.3d at p. 252.) Having determined that no arbitrary discrimination problem exists, we conclude that the words “enter, remain, stay or loiter” do not need to be infused with a sinister connotation to pass constitutional muster.
*Supp. 18 The complete closure of a park for a specified time period is unlike the situation where the park is not closed to all persons but, instead, the presence of some persons is prohibited while the presence of others is allowed with the determination being left to the unfettered discretion of a law enforcement officer.[12] (See, e.g., Alves v. Justice Court (1957) 148 Cal.App.2d 419, 420, 424-425 [306 P.2d 601]; cf. In re Nancy C., supra, 28 Cal.App.3d 747, 757.) We also distinguish the situation where a law is arbitrarily enforced against one person but not others whose conduct was equally proscribed. Such an invidious incident does not affect the constitu *Supp. 19 tionality of the law itself but merely concerns the issue of its discriminatory enforcement as applied to a particular defendant. (People v. Superior Court (Hartway), supra, 19 Cal.3d 338, 348; see also Murgia v. Municipal Court (1975) 15 Cal.3d 286, 295 [124 Cal.Rptr. 204, 540 P.2d 44].)
We reject defendant’s remaining challenge that in order for the park closure regulation at issue to be valid it must afford “actual” notice, i.e., sufficiently illuminated signs announcing the park’s closure for the specified late night hours at every entrance and path in the park. As sole support for this proposition, defendant relies upon Lambert v. California (1957) 355 U.S. 225 [2 L.Ed.2d 228, 78 S.Ct. 240] wherein the Supreme Court overturned a defendant’s conviction under a Los Angeles Municipal Code section which required any person convicted of a felony to register with the police.
The Lambert court noted that the mere failure to register constitutes wholly passive conduct and that “violation of its provisions is unaccompanied by any activity whatever, mere presence in the city being the test.” (Id., at pp. 228-229 [2 L.Ed.2d at p. 232].) The question before the court was “whether a registration act of this character violates due process where it is applied to a person who has no actual knowledge of his duty to register, and where no showing is made of the probability of such knowledge. ” (Id., at p. 227 [2 L.Ed.2d at p. 231].) The court held that “[w]here a person did not know of the duty to register and where there was no proof of the probability of such knowledge, he may not be convicted consistently with due process.” (Id., at pp. 229-230 [2 L.Ed.2d at p. 232].)
Defendant’s reliance on Lambert is misplaced. Subsequent Supreme Court decisions have limited Lambert to its peculiar factual context. (See, e.g., Texaco, Inc. v. Short (1982) 454 U.S. 516, 537, fn. 33 [70 L.Ed.2d 738, 756, 102 S.Ct. 781]; United States v. Giles (5th Cir. 1981) 640 F.2d 621, 628.) We know of no reason to apply its holding or rationale to the facts of the present case, especially in view of defendant’s actual notice of the conduct prohibited.[13]
 “The rule is well established . . . that one will not be heard to attack a statute on grounds that are not shown to be applicable to himself ...” (In re Cregler, supra, 56 Cal.2d 308, 313; accord People v. Katrinak, supra, 136 Cal.App.3d 145, 158; cf. People v. Fogelson (1978) 21 Cal.3d 158, 163-164 [145 Cal.Rptr. 542, 577 P.2d 677]; see *Supp. 20 also Gates v. Municipal Court (1982) 135 Cal.App.3d 309, 312-313, fn. 2 [185 Cal.Rptr. 330]).
Parenthetically, we observe that defendant has confused the notice component of due process, a constitutional mandate, with the preferred practice of placing signs at strategic points to inform persons as to what is prohibited. The “actual” notice mandated by due process is that “a penal statute define with sufficient definiteness that ordinary people can understand what conduct is prohibited . . . .” (Kolender v. Lawson, supra, 461 U.S. 352, — [75 L.Ed.2d 903, 909, 103 S.Ct. 1855, 1858]; but see Burg v. Municipal Court, supra, 35 Cal.3d 257, 270-271, fns. 15-17.)
From the maxim of jurisprudence that everyone is presumed to know the law arises the postulate that ignorance of the law is no defense to its violation. (See 1 Witkin, Cal. Crimes, § 148, p. 141.) Accordingly, lack of actual knowledge of the provisions of section 63.44(B)(14) is of no legal significance, the pivotal inquiry being “whether the defendant was aware that he was engaging in the conduct proscribed by that section.” (People v. Snyder (1982) 32 Cal.3d 590, 593 [186 Cal.Rptr. 485, 652 P.2d 42]; accord People v. Little (1983) 143 Cal.App.3d Supp. 14, 21 [192 Cal.Rptr. 619].)
II*

The judgment is affirmed.
Reese, P. J., and Bernstein, J., concurred.

See footnote 3, post, page Supp. 6.

The summary of facts is consonant with our duty to view the evidence in a light favorable to the judgment. (People v. Redmond (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

A11 future references to “section” are to the Los Angeles Municipal Code unless otherwise indicated. Section 63.44(B)(14) provides: “No person shall enter, remain, stay or loiter in any park between the hours of 10:30 o’clock p.m. and 5:00 o’clock a.m. of the following day; except that no person shall remain, stay or loiter on Royal Palms Beach between the hours of 8:00 o’clock p.m. and 5:00 o’clock a.m. of the following day. On any public park or recreational facility subject to this Section, the supervising employee at such site may extend the 10:30 p.m. closing time for up to one hour to accommodate any departmentally approved event. [¶] Except for Royal Palms Beach, the closing hours specified in the first paragraph of this subdivision shall not apply to those parks which consist of an ocean, beach, or pier under the control, operation or management of the Los Angeles County Department of Beaches.”

No discussion is necessary of part II, which disposes of defendant’s meritless jury instruction claims, inasmuch as part II presents no publishable point. (Cal. Rules of Court, rule 976.1.)

We observe that the concepts of overbreadth and vagueness overlap but do not coincide. For instance, where a law encompasses both innocent and criminal conduct (see, e.g., In re Cregler (1961) 56 Cal.2d 308, 312 [14 Cal.Rptr. 289, 363 P.2d 305]; In re Huddleson (1964) 229 Cal.App.2d 618, 625 [40 Cal.Rptr. 581]), that law is overbroad. The void-for-vagueness doctrine comes into play for the reasons that a person is not then on notice as to what conduct is proscribed and arbitrary law enforcement is thereby encouraged (see, e.g., Kolender v. Lawson (1983) 461 U.S. 352, 357 [75 L.Ed.2d 903, 909, 103 S.Ct. 1855, 1858]). On the other hand, the vagueness doctrine also intrinsically extends to laws that may not be overbroad but are so imprecise that a person must guess as to their meaning and application. (See, e.g., Burg v. Municipal Court (1983) 35 Cal.3d 257, 270 [198 Cal.Rptr. 145, 673 P.2d 732].) Moreover, a law is overbroad but not necessarily vague where the law engulfs conduct having only an attenuated or no nexus to the law’s purposes. (See, e.g., Annot., 45 L.Ed.2d 725, 735-736 (1976).)

For a comprehensive annotation concerning curfew laws, see generally, Annotation (1974) 59 A.L.R.3d 321. “Ballentine’s Law Dictionary (3rd ed) defines a curfew as a fixed point of time in the evening, after which persons not having duties to perform on the streets, particularly children, shall not be abroad.” (Id., at p. 325, fn. 4.) See, also, the discussion of curfew statutes in In re Nancy C., supra, 28 Cal.App.3d 747, 755, 756.
For a comprehensive annotation concerning loitering laws, see generally, Annotation (1969) 25 A.L.R.3d 836 and later cases (1983 pocket supp.) pages 45-51.

“Antiloitering statutes ‘represent an arena for conflict between healthy antipathy to the “roust” or arrest on suspicion, on the one hand, and legitimate interests in crime prevention, on the other. Security against arbitrary police intrusion is basic to a free society. [Citation omitted.] Thus, arrests on mere suspicion offend our constitutional notions. Frequently they amount to arrest for status or condition instead of unlawful conduct. Most of the provisions of the now repealed vagrancy statute (former Pen. Code, § 647) were concerned with status rather than conduct.
“ ‘At the opposite side of the scale is the view that law enforcement officers need not wring their hands in constitutional frustration while nighttime prowlers and potential thieves and rapists skulk through our neighborhoods. The usual accommodation between these warring notions is the concept of “reasonable cause,” that is, an officer may properly inquire, search and sometimes arrest if he has reasonable cause to believe that a crime has been committed. [Citation omitted.]’” (People v. Caylor (1970) 6 Cal.App.3d 51, 56 [85 Cal.Rptr. 497], quoting with approval from People v. Bruno (1962) 211 Cal.App.2d Supp. 855, 859 [27 Cal.Rptr. 458]; see generally, In re Nancy C., supra, 28 Cal.App.3d at pp. 751-752.)

We are in accord with defendant’s basic contention that “[t]o constitute crime there must be unity of act and intent. In every crime or public offense there must exist a union, a joint operation of act and intent, or criminal negligence.” (Pen. Code, § 20.) We further agree that, as a general proposition, some crimes require specific intent, not mere general intent, for the commission of such crimes. (See discussion in 17 Cal.Jur.3d, Criminal Law, §§ 59-63, pp. 105-113; People v. Daniels (1975) 14 Cal.3d 857, 860 [122 Cal.Rptr. 872, 537 P.2d 1232].)
Nevertheless, the established exception to the mandated intent element in every criminal offense involves the “so-called ‘public welfare’ or ‘malum prohibitum’ crimes which are punishable despite the absence of any criminal intent or criminal negligence. ...” (People v. Calban (1976) 65 Cal.App.3d 578, 584 [135 Cal.Rptr. 441].) Where the state, in the exercise of its police power, denounces certain acts as criminal, “the mere commission of such acts, regardless of any evil intent, is sufficient to constitute the crime so denounced,” unless the statute itself uses language expressing the requirement of an intent. (People v. Pera (1918) 36 Cal.App. 292, 304 [171 P. 1091].) These offenses usually involve light penalties and no moral obloquy or damage to reputation. Although criminal sanctions are *Supp. 13 relied upon, the primary purpose of the statutes is regulation rather than punishment or correction. The offenses are not crimes in the orthodox sense, and wrongful intent is not required in the interest of enforcement.” (People v. Vogel (1956) 46 Cal.2d 798, 801, fn. 2 [299 P.2d 850]; see generally, Ostrow v. Municipal Court (1983) 149 Cal.App.3d 668, 674-676 [197 Cal.Rptr. 40]; 17 Cal.Jur.3d, supra, §§ 64, 66, pp. 113-114, 117-119.)

We note that the Los Angeles Municipal Code separately provides for park closures for the duration of an emergency, such as a flood, fire, accident, other disaster, riot, or unlawful assembly, “to any and all persons not authorized to enter or remain within such closed area.” (§ 63.45, subd. A.) Moreover, it proscribes any unauthorized person’s wilful and knowing entry into such a closed area and forbids anyone from wilfully remaining within such areas after receiving notice to evacuate or leave that area. (§ 63.45, subd. B.) Defendant concedes the propriety of such an emergency park regulation. (See State v. Allred (1974) [204 S.E.2d 214].)
Parenthetically, we express no opinion concerning the right of a municipality, if any, to promulgate a rule or enact regulations which would affect the complete closure of a street or other thoroughfares that cut through a park for any particular period of time. “The regulation of traffic on streets is not one of those ‘municipal affairs’ over which local authorities are given power superior to that of the Legislature. (County of Los Angeles v. City of Alhambra (1980) 27 Cal.3d 184, 192-193 [165 Cal.Rptr. 440, 612 P.2d 24]; Pipoly v. Benson (1942) 20 Cal.2d 366, 369 [125 P.2d 482, 147 A.L.R. 515]; Cal. Const., art. XI, § 5.)” (Rumford v. City of Berkeley (1982) 31 Cal.3d 545, fn. 3 [183 Cal.Rptr. 73, 645 P.2d 124].)

The Clark court explained that: “Reasonable time, place, and manner restrictions are valid even though they directly limit oral or written expression. It would be odd to insist on a higher standard for limitations aimed at regulable conduct and having only an incidental impact on speech. Thus, if the time, place, and manner restriction on expressive sleeping, if that is what is involved in this case, sufficiently and narrowly serves a substantial enough governmental interest to escape First Amendment condemnation, it is untenable to invalidate it under O ’Brien on the ground that the governmental interest is insufficient to warrant the intrusion on First Amendment concerns or that there is an inadequate nexus between the regulation and the interest sought to be served. We note that only recently, in a case dealing with the regulations of signs, the Court framed the issue under O’Brien and then based a crucial part of its analysis on the time, place, and manner cases. City Council v. Taxpayers for Vincent, 466 U.S. 789, — (1984).” (Clark, supra, 468 U.S. at p. —, fn. 8 [82 L.Ed.2d at p. 230]; see also Hudgens v. NLRB (1976) 424 U.S. 507, 520 [47 L.Ed.2d 196, 207, 96 S.Ct. 1029]; In re Hoffman (1967) 67 Cal.2d 845, 849 [64 Cal.Rptr. 97, 434 P.2d 353]; Cox v. New Hampshire (1941) 312 U.S. 569, 576 [85 L.Ed. 1049, 1053-1054, 61 S.Ct. 762, 133 A.L.R. 1396]; Cox v. Louisiana (1965) 379 U.S. 536, 554 [13 L.Ed.2d 471, 483-484, 85 S.Ct. 453].)

We observe that the closure of public parks during the late night hours also serves incidentally to deter those who would cloak themselves in dark of night to vandalize the parks or commit other acts of malicious mischief. We do not sanction such park closures as excusing the usual mandated criminal intent set forth in the respective statutes covering such conduct. (See, e.g., Pen. Code, § 602, subd. (e), [The wilful commission of a trespass by “[d]igging, taking, or carrying away any earth, soil, or stone” from a recognized or established park without a license is a misdemeanor]; Pen. Code, § 622 [“Every person, not the owner thereof, who willfully injures, disfigures, or destroys any monument, work of art, or useful or ornamental improvement within the limits of any . . . public park or place, is guilty of a misdemeanor”]; see also Pub. Resources Code, §§ 5193, 5560, 5782.24 (now 5782.21), 5380.)

The thrust of defendant’s position is that the City of Los Angeles is depriving him of his right to liberty without affording him procedural due process of law, i.e., section 63.44(B)(14) is not defined with the requisite specificity to place a person on notice as to what conduct is prohibited and encourages arbitrary law enforcement. (Kolender v. Lawson, supra, 461 U.S. 352, 357 [75 L.Ed.2d 903, 909, 103 S.Ct. 1855, 1858].) Defendant makes no substantive due process claim, i.e., he has a fundamental right to be in a public park. No such claim is in fact cognizable. Although there is a substantial liberty interest attendant to enjoyment of a public park, we conclude that such an interest is not a fundamental right requiring the application of a strict scrutiny analysis. (See Clark, supra, 468 U.S. —.)

At this juncture, we emphasize our conclusion that section 63.44(B)(14) is merely a park closure regulation, not a regulation properly characterized as a true curfew, albeit cases in other jurisdictions have so labeled the park closure ordinances at issue there. We observe that curfew statutes have been generally classified into two groups according to the conduct proscribed, i.e., “presence” or “loitering.” (See, e.g., In re Nancy C., supra, 28 Cal.App.3d at pp. 755, 776-777.) We concur, however, with the conclusion of the court in Bykofsky v. Middletown (1975) 401 F.Supp. 1242 that “[attempts to define words in terms of one type of curfew or the other is [Re] meaningless and can be confusing.” (Id., at p. 1252.)
Closure of a park for a specified time period means that the public in general is barred from the use of the park for the duration of such closure. In effect, it is the same as limiting the public’s right to use a library or other public facility to the hours the facility is open to the public. There is no rational reason for differentiating parks from other facilities in that regard, except that parks may be used overnight for camping, which includes sleeping. Nonetheless, no one can seriously assert that a municipality cannot enact a regulation closing down its parks during the late night hours to conserve wear and tear upon those parks or that overnight camping is a fundamental right.
We are aware that the closure of a park prohibits the presence of the public in the park and that certain cases have invalidated curfew ordinances which proscribe mere “presence” alone. We find those cases distinguishable. “The rationale of those cases holding that ordinances proscribing ‘presence’ are unconstitutional is that they are unnecessarily broad. As the court noted in Alves v. Justice Court, supra, 148 Cal.App.2d 419, 424-425: ‘True, the ordinance would preclude aimless loitering by minors in public places during the hours set forth, but it would also make unlawful many other activities by minors which otherwise would be entirely lawful.’ (Italics added.)” (In re Nancy C., supra, 28 Cal.App.3d at p. 756; see also People v. Teresinski, supra, 30 Cal.3d 822 at fn. 5.)
Likewise distinguishable are those cases invalidating curfew ordinances proscribing mere “presence” of anyone, not only minors. Those ordinances often encompassed the entire parameters of the municipality in question, or every street, or every public place. As such, the scope of such ordinances was open-ended, and thus, those ordinances were void for overbreadth and vagueness. (See, e.g., Portland v. James (1968) 251 Ore. 8 [444 P.2d 554] [court struck down city ordinance which made it unlawful for any person to roam or be upon any street, etc., between the hours of 1 a.m. and 5 a.m. without having and disclosing a lawful purpose]; cf. Peters v. Breier, supra, 322 F.Supp. 1171, at p. 1172 [court distinguished Portland on the basis that unlike the Portland ordinance, “which broadly restricted Ae use of any street, alley, or public place, Ae ordinance in question carefully delimits the curfew to a small, localized area.” (Ibid.)].) AlAough not all parks in the City of Los Angeles can be characterized as “small,” e.g., Griffith Park, Ae basic analysis of the Peters court remains valid as applied to Ae present case. In oAer words, a park closure or “curfew” ordinance which proscribes Ae mere “presence” of anyone in a public park during late night hours is not void for overbreadA since a park is necessarily a “localized area.” “Ordinarily, Ae word ‘park’ refers to an open or enclosed tract of land which is designed or set apart for Ae comfort and enjoyment of Ae inhabitants of Ae locality. ” (48 Cal. Jur.3d, Parks, etc., § 1, p. 32; see Archer v. Salinas City (1892) 93 Cal. 43, 50 [28 P. 839].)

That issue was determined against defendant at the time of trial. Defendant’s failure to claim insufficiency of the evidence on appeal precludes our review of that issue. We note, however, that there was ample evidence to support a finding that defendant had actual knowledge of the signs announcing the park was closed, even if the existence of such knowledge were relevant. (People v. Roberts (1975) 51 Cal.App.3d 125, 128 [123 Cal.Rptr. 893].)

See footnote 3, ante, page Supp. 6.